Ex PARTE HILL, IN RE ARMISTEAD *vs.* CONFEDERATE STATES.

[APPLICATION FOR PROHIBITION TO PROBATE JUDGE.]

Ex PARTE DUDLEY.

[APPLICATION FOR MANDAMUS IN MATTER OF HABEAS CORPUS.]

1. *Jurisdiction of State courts to discharge enrolled conscript from custody of Confederate States officer.*—On petition for *habeas corpus*, by a person who, being liable to military service under the act of congress approved April 16th, 1862, commonly called the "first conscript law," procured and placed in his stead a substitute, and was thereupon discharged; but, after the passage of the "second conscript law," ap-

Ex parte Hill, in re Armistead v. Confederate States.

proved September 27th, 1862, was again arrested by the enrolling officer, on the ground that his discharge had become inoperative, because his substitute was personally liable to service under the latter law,—the State court or judge to whom the application for the writ is made, has jurisdiction to determine the question of fact, whether the petitioner placed in his stead a substitute, and was thereupon discharged; and also the question of law, whether such discharge exempted the petitioner from liability to service under the latter law, his substitute being within the conscript age as therein specified. (A. J. WALKER, C. J., *dissenting.*)

2. *Same.*—The commandant of conscripts, at one of the camps of instruction, having vacated, on the ground of fraud, a discharge procured by a person who, being liable to military service under the "conscript laws" of Congress, had furnished a substitute in his stead; and the decision of the commandant having been approved by the secretary of war,—a State court or judge has no jurisdiction, on *habeas corpus* or otherwise, to revise or control the action and decision of the commandant, at the instance of the person whose discharge is thus vacated, on the ground that *ex-parte* affidavits were received against him on the trial, or that he was not notified of the time and place of taking testimony, or that he was not allowed an opportunity to cross-examine witnesses. (R. W. WALKER, J., *dissenting.*)

3. *Liability of principal to military service under "second conscript law," having furnished substitute under first.*—The 9th section of the "first conscript law" of congress declaring, that persons not liable to military service "may be received as substitutes for those who are, under such regulations as may be prescribed by the secretary of war;" and the general orders (No. 37) published by the secretary of war on the 19th May, 1862, providing, in reference to exemptions procured by furnishing substitutes, that "such exemption is valid only so long as the said substitute is legally exempt,"—a person who was liable to conscription under said law, and who, after the publication of said general orders, placed in his stead a substitute who was between the ages of thirty-five and forty years, and thereupon obtained his discharge, became again liable to conscription, on the passage of the "second conscript law," and the president's call for men between the ages of thirty-five and forty years; and the same principle applies to persons who furnished substitutes after the publication of the general order (No. 64) dated September 8, 1862, which declares, that "a substitute becoming liable to conscription renders his principal also liable." (*Per tot. cur.*)

THESE two cases, though decided together, were argued and submitted at different times. The first was an application by L. H. Hill, an officer of the provisional army of the Confederate States, and the enrolling officer of the district embracing the county of Montgomery, for a writ of prohibition to the probate judge of said county, enjoin-

ing and restraining him from further proceedings in the matter of a petition for *habeas corpus*, sued out before him by W. B. Armistead, who sought thereby to procure his release from the custody of said enrolling officer, on the ground that he had obtained a discharge from military service by placing a substitute in his stead. This application was made on a regular motion day of the January term, 1863, and was submitted at the same time with the last preceding case; being argued at the bar by P. T. SAYRE, on behalf of the Confederate States, and by S. F. RICE and JNO. A. ELMORE, with whom was A. B. CLITHERALL, for the petitioner Armistead.

The other case was an application by Charles H. Dudley, for a *mandamus*, or other remedial writ, directed to the Hon. N. W. COCKE, the chancellor of the southern chancery division, by which the petitioner sought to obtain a full hearing on *habeas corpus* before said chancellor, and a discharge from custody as a conscript. All the material facts of the case are stated in the opinion of STONE, J.

STONE, J.—The precise line of division which separates State and Confederate judicial authority, is not always easy of expression, if indeed it be easy of ascertainment. Operating, (within the sphere of its appointed powers,) as each government confessedly does, upon the same territorial area, and upon the same persons, it requires, in some cases, the closest scrutiny to prevent encroachment by one power upon the other. If either government, in the performance of its functions, by mistake or otherwise, transgress the boundary line which separates them, and trespass on the domain of another, such conduct does not conclude the other government, nor estop it from asserting and enforcing its own rights. On the other hand, if either government, or its officers, act within the sphere of its powers, although such action may be erroneous and reversible, it is not, except in certain specified cases, within the power of the other government to control its action thus performed, nor to correct the errors that

Ex parte Hill, in re Armistead v. Confederate States.

may be committed. The distinction is between a want of authority over the person or thing, and an erroneous exercise of authority possessed. If the subject-matter be within the legal cognizance of the officer acting, no matter how far that officer may err in adjudicating or applying the law to such subject-matter, the redress, if any, must, as a general rule, be sought in the courts of the government whose officer has committed the error. But, if the officer exercise authority over a subject or person not within his official cognizance, the judicial officers of the other government may give redress, if the subject-matter be within the general scope of their jurisdiction.

The distinction attempted to be drawn above may be illustrated by the two cases of *Slocum v. Mayberry*, (2 Wheat. 1,) and *McClung v. Silliman*, (6 Wheat. 599.) The case of *Slocum v. Mayberry* arose under the 11th section of the embargo law, approved April 25, 1808, (2 U. S. Stat. at Large, 501,) which authorized the collectors of the customs " to detain any vessel ostensibly bound with a cargo to some other port of the United States, whenever in their opinions the intention is to violate or evade any of the provisions of the acts laying an embargo, until the decision of the president of the United States be had thereupon." Under this act, the collector of the port of Newport, Rhode Island, had a vessel, with its cargo, seized by Slocum, the surveyor of the port; and Mayberry, the owner of the cargo, brought his action of replevin for the same in the State court of Rhode Island. The question was, had the State court jurisdiction? The supreme court of the United States, Chief-Justice Marshall delivering the opinion, decided, that if the question had arisen on the seizure of the *vessel*, the State court would have had no jurisdiction; but, inasmuch as the collector had no power or authority to detain the *cargo*, the act of congress not making provision for its detention, the State court had jurisdiction of the case.

In the case of *McClung v. Silliman*, the attempt was made to control, by *mandamus* from a State court, the offi-

cial conduct of a register of a land-office of the United States, in the matter of a pre-emption claim. The court ruled, that the State court had no authority to direct or govern the official conduct of the register of the United States land-office.

So, it has been ruled, that if a marshal of the United States levy on goods under process against A, and B claim the goods as his property, in a suit by B against the marshal, State courts have jurisdiction of the question, whether the property belongs to B or to A.—*Dunn v. Vail,* 7 Mar. La. 416 ; *Bruen v. Ogden,* 6 Hals. 370. See, also, *United States v. Peters,* 5 Cranch, 115, 135; *McKim v. Voorhies,* 7 Cranch, 279; *Diggs v. Wolcott,* 4 Cranch, 179 ; *Kitteridge v. Emerson,* 15 N. H. 227 ; *McNutt v. Bland,* 2 Howard, U. S. 9.

Chancellor Kent's statement of the principle under discussion is as follows : "If the officer of the United States who seizes, or the court which awards the process to seize, has jurisdiction of the subject-matter, then the inquiry into the validity of the seizure belongs exclusively to the Federal courts. But, if there be no jurisdiction in the instance in which it is asserted—as if a marshal of the United States, under an execution in favor of the United States against A, should seize the person or property of B— then the State courts have jurisdiction to protect the person and property so illegally invaded."

Springing out of the principles settled in the cases of *Slocum v. Mayberry,* and *McClung v. Silliman, supra,* I think the following propositions may be laid down :

First : Whenever an officer, under authority in the premises conferred by the government under which he is acting, is in the performance of official duties; and, in the performance of such duties, there is expressed, or necessarily implied, the right to decide upon qualifications, or to draw inferences from facts, then any error of conclusion, or of judgment, into which he may fall, is not subject to revision or correction by the officers of the other government, nor is the officer acting subject to the coercive con-

trol thereof, unless the constitution or laws give to the officers of the latter government such control or power of revision.

Second : Whenever the question is—not whether the officer correctly decided or acted in a matter within the scope of his power and jurisdiction—but, the inquiry is, has he erroneously applied his authority or jurisdiction to a person or subject-matter not within its scope, then the courts of the other government, if the subject and person be of a class which comes within their jurisdiction, may inquire of and determine the question of such erroneous application of authority, unless the law, in its terms, inhibit such inquiry.

There is scarcely any human action that is so entirely independent of all others, that in its performance it does not presuppose the existence of some other fact, past or present. These do not necessarily inhere in the subject-matter in hand, but are the accidents of the particular case. All actions are shaped or moulded, more or less, by their accidents, and by the decision which the actor pronounces upon them. Slocum, in seizing the vessel and cargo, construed the act of congress for himself and attained the conclusion, that it was his duty to detain the cargo as well as the vessel. In this, he traveled beyond his authority. The act of congress clothed the collector with authority to decide, in the first instance, whether it was the intention to violate or evade any of the provisions of the acts laying an embargo ; and if, in his opinion, such was the intention, he was authorized to detain the vessel. He had no authority to detain the cargo. The question of detaining the cargo did not inhere in, or pertain to, the other and main question, namely, was there an intention to violate or evade the law? He erred in deciding this question of law. So, in the case of the marshal who seized the goods of B under process against A. He went beyond his authority when he seized the goods of B, and by that act became a trespasser. True, in seizing the goods of A, he must necessarily determine for himself, in

the first instance, what goods belonged to A; but the decision was rendered necessary only by the accident that the goods of A and B were in a state of confusion. This is no more than the case of C and D, co-terminous land-proprietors, between whom the boundary is open and unascertained; if C, whether by mistake or otherwise, go over the line upon the lands of D, and there cut timber, he is a trespasser, and it does not excuse him that, in endeavoring to find his own land, he must necessarily decide where the boundary is.

The case of *McClung v. Silliman, supra,* illustrates the other phase of this question. In that case, the effort was made, through the instrumentality of a State court, to compel the register of the land-office to receive proof of the legal acts, and to prepare and furnish the documents which should initiate the applicant's claim to a pre-emption interest in a tract of land. The register refused the application. It will be observed, that the register was an officer of the United States, and was specially charged with the hearing of such applications, and with receiving and acting on the evidences on which such claims were based; and that all this was done under laws and rules enacted and established by the government of the United States. These several acts were part and parcel of the functions with which the land-officer was expressly clothed, and pertained naturally and universally to the service in which he was engaged. They were not the accidents of the case, but were important functions committed to him, which were called into exercise in every application for pre-emption made in his district. The supreme court of the United States denied the jurisdiction of the State court to control the action of the register by *mandamus,* saying: "The question in this case is as to the power of the State courts over the officers of the general government, employed in disposing of that land, under the laws passed for that purpose. And here it is obvious, that he is to be regarded, either as an officer of that government, or as its private agent. In the one capacity or the other, his conduct can only be controlled by the power that created him."

The precise facts of Mr. Armistead's case, as made by the petition for *habeas corpus*, are as follows : In August, 1862, the petitioner, being liable to conscription, procured and placed in the service of the Confederate States a substitute who was over thirty-five years of age ; said substitute was accepted by the proper military authorities, and was mustered into the service, and thereupon the said Armistead received his discharge. The enrolling officer, contending that the probate judge has no jurisdiction of the questions presented by Mr. Armistead's petition, makes application to us for the writ of prohibition to that officer.

The questions which arise on the face of the petition for *habeas corpus*, are : First, was a substitute for Mr. Armistead accepted by the proper government officer, and did he (Mr. Armistead) receive his discharge ? Second, is the legal effect of that discharge such as to exempt Mr. Armistead from conscription under the "act to amend an act entited ' an act to provide for the public defense,' approved April 11, 1862, " commonly called the " second conscript act ?"—C. S. Statutes at Large, 2d session of 1st Congress, p. 61.

No question is made in this case on the fairness of the transaction by which Mr. Armistead obtained and put in his substitute ; and nothing need be said in this case on that head.

We hold, that the probate judge had jurisdiction of each of the questions above stated. The first is a question of fact, which does not involve any revision or possible reversal of any decision pronounced by the Confederate officer or officers, charged with the duty of receiving substitutes. It does not involve the inquiry, did the officer act rightly in granting the discharge ? The only question is, did he act ? If the petition for *habeas corpus* truly state the facts, the petititioner had received his discharge from military service ; and the question of fact was, discharge *vel non*. The act of congress approved April 16, 1862, (§9,) provides, "that persons not liable for duty, may be received as substitutes for those who are, under such regu-

30

lations as may be prescribed by the secretary of war "—
Pamphlet Acts 1st session of 1st Congress, p. 31.    General
orders Nos. 29 and 30, of 1862, of dates 26th and 28th.
April, provide, that on the receipt and mustering in of
such substitute, the principal furnishing the substitute
shall receive his discharge.

The second question was one of law ; namely, does the.
discharge thus obtained, and not vacated for fraud, operate
an exemption from military service under the second con-
script law ?    The decision of this question by the probate
judge does not involve a revision of any executory action
of the Confederate officer.    If it be a revision of anything,
it is simply of the decision of the Confederate officer, pro-
nounced on the legal effect of certain acts, previously per-
formed ; nothing more nor less than determining whether
the officer rightly decided the legal question as to the effect
of the substitution and discharge—the accident of Mr.
Armistead's case.    If both of these questions be decided in
favor of Mr. Armistead, he stands absolutely and uncondi-
tionally exempt from liability to conscription, under the
law, as it then stood.    If either of them be decided against
him, he was not illegally restrained of his liberty.    The
decision of neither of the questions could have the effect of
reversing or annulling any action of the Confederate officer,
the performance of which was specially or exclusively con-
fided to him.    The writ of prohibition must be refused.—
Ex parte *Hill*, at the last term.

Judge R. W. WALKER agrees with me in the foregoing
conclusions, as to the jurisdiction of the probate judge in
the case of Armistead, for reasons stated by himself.
Chief-justice A. J. WALKER dissents, for reasons stated by
himself.

The bill of exceptions in the case of Charles H. Dudley
omits many dates, and, in other respects, leaves us in doubt
as to the true state of facts on which the chancellor pro-
nounced his decision.    The present application seeks to
reverse and control the action of the chancellor; and, under

a well-known rule, it is our duty to draw every fair inference favorable to his correct ruling. If there be error, the party excepting must affirmatively show its existence. Shep. Dig. 572, §§ 145, 146; *Doe v. Godwin*, 30 Ala, 242; *Guilford v. Hicks*, 36 Ala. 95.

The record informs us, that Mr. Dudley attempted to show, on the trial of the *habeas corpus*, the following state of facts; That in August, 1862, he reported himself at camp Watts, with one Peters, who was examined, accepted, and mustered into service as Dudley's substitute, and he (Dudley) thereupon received his discharge; that some time afterwards, (date not given,) Major Swanson, commandant of conscripts at that camp, had him (Dudley) ordered back to camp, and detained him there; that the pretense on which he was ordered back, was some alleged fraud or duress practiced in procuring and putting in his substitute, Peters; that he applied to the secretary of war for leave to examine witnesses, and to cross-examine those against him; that this application was received by the secretary of war in December, 1862; that thereupon the sentence was suspended, and time allowed to rebut the evidence against him; that petitioner sought to have an order made, requiring mutual notices of the time and place of taking testimony, but failed to obtain such order; that on the last day allowed to petitioner to produce proofs, &c., *ex-parte* affidavits were again produced against him, heard as evidence, and the former decision sustained; that he again applied to the secretary of war to open and extend the time for the examination of witnesses, but his application was refused,—the secretary of war ruling that the substitution was set aside for fraud.

No dates are specified when any of these transactions took place, except three: first, the order of the secretary of war, made December 1, 1862, instructing the commandant to discharge Peters and detain Dudley; second, the time alleged, December, 1862, when the secretary of war received Dudley's first application to extend the time for testimony; and, third, that the extended time expired

February 20th, 1863, for taking testimony in the cause. The application for *habeas corpus* was sworn to April 6th, 1863.

When the trial had so far progressed, as to bring to the notice of the chancellor the fact that the substitution had been set aside for fraud, and the order of the secretary of war had been issued thereon, refusing further extension of time, and approving the detention of Mr. Dudley as a conscript, the chancellor refused to proceed with the examination, declining to re-try the question of fraud in the matter of putting in Peters as a substitute for Dudley. We are asked to control the action of the chancellor by *mandamus*, or such other writ as may be necessary for the purpose.

We are not able to affirm positively whether or not the first order, vacating the substitution for fraud, was made before or after November 3d, 1862 ; but we must presume it was made after that time, as that presumption is most favorable to the correct ruling of the chancellor. The dates given incline us to believe such was the fact.

In general order No. 82, for the year 1862, under date of November 3d, are found orders relating to substitution, from which I make the following extract : "When a person claims exemption, on the ground that he has put a substitute in service, he must exhibit to the enrolling officer a discharge from some company, signed by the commanding officer of the regiment or command to which the said company belongs, or then belonged, (see general order No 26,) or an exemption signed by the commandant of conscripts. And if the said discharge or exemption do not show that it was granted in consideration of a substitute having been furnished, such fact must be certified in writing by the commanding officer of the regiment or command to which the company belongs, or by the commandant of conscripts, as the case may be. But, in all cases arising within thirty days from the date of this order, the enrolling officer may grant the exemption, upon satisfactory proof that the party furnished a substitute, who was actually received into the service of the Confederate States for three years or the

war, and the substitute is not liable to military service. Such exemption may at any time be cancelled, if fraud or mistake be discovered."

I have given this lengthy extract, not because each clause, *per se*, bears on the question before us, but to show by the context what are the meaning and purpose of the last clause quoted. What, then, is the meaning of the language, "such exemption may at any time be cancelled, if fraud or mistake be discovered?" Obviously, not that the agreement between the principal and the substitute should, as a binding obligation between themselves, be liable to be cancelled for fraud, under proceedings had in the courts of the country. That right, so far as they were individually concerned, existed independently of the order. Nor, indeed, had the secretary of war the power of conferring such right upon mere private parties, nor of clothing State courts with such authority.—2 Story on Cons. §§ 1755–6, and note 2. Such an order, having that object, could not be regarded as a regulation of the privilege of putting substitutes in the army. Moreover, it can not be supposed that the Confederate government, even if it had the power, would deem it necessary to furnish the parties with a safeguard against imposition among themselves, cumulative and special, beyond that which all citizens enjoy under the general law. Fraud upon the public service was evidently had in contemplation. This is shown by the language of the order, and by the context, and is fully confirmed, if confirmation be necessary, by the great notoriety which the numerous frauds of that kind had acquired in the country.

This being the case, it is manifest that the inquiry of fraud *vel von*, for which the order makes provision, was not intended to take place in the ordinary course of proceedings in the courts of the country. The intention was, that the commanding officer, or commandant of conscripts, should inquire of and determine the question of fraud in the matter of the substitution. The purpose of the order was, to protect the public service against frauds on the privilege

of putting in substitutes. The officers above named were, by irresistible implication, charged with the duty of trying the question of fraud; and, if it were found to exist, of cancelling the exemption. There is, doubtless, a final appeal to the secretary of war in such cases ; but, when the decision is finally pronounced, the result is, if there has been fraud, to turn the substitute out of the service, and to place the principal in. In passing upon the question of fraud *vel non*, the commanding officer, commandant of conscripts, or secretary of war, as the case may be, must necessarily and uniformly hear and decide upon evidence, and draw inferences from facts. These things inhere in the very nature of the inquiry to be made. They always come up, and, hence, are not the accidents of the particular case. They are like the preliminary proofs, and documentary exemplifications, which pertain to the functions of a land-office register, in the matter of pre-emption claims. To allow the State courts to re-try or re-examine the facts on which such decision is pronounced, is to give to the courts of the State government appellate jurisdiction over the commanding officers, commandant of conscripts, or the secretary of war ; officers who receive their appointments from the Confederate government, and who are specially charged, by that government, with the performance of these functions. The issue is not solely, nor even mainly, between the principal and the substitute. The Confederate government is directly concerned in the result ; and, in its military service, will be the chief sufferer from a reversal of the decision pronounced by the commanding officer, or other officer acting in the premises. State courts have no authority to re-try the question of fraud *vel non*, in the matter of putting a substitute into the army, under the rules above copied.

If the commandant of conscripts, or the secretary of war, in violation of the plain rules of law, cancelled the substitution in this case, on evidence furnished by *ex-parte* affidavits, or refused to require notice of the time and place of taking the testimony, or did not afford to Mr. Dudley an

Ex parte Hill, in re Armistead v. Confederate States.

opportunity to cross-examine the witnesses against him, each and all of these are but an erroneous exercise of rightful authority—not usurpation. The redress, if there be any, must be invoked from the authorities of that government which created the officer, and clothed him with his functions.—*McClung v. Silliman*, 6 Wheat. 598 ; *Ableman v. Booth*, 21 How. 506.

The chancellor did not err in refusing to re-try the question of fraud ; and the motion of petitioner must be denied.

The chief-justice concurs in this conclusion. His own opinion contains his reasons. The opinion of Judge R. W. WALKER shows how he stands.

Mr. Armistead's application for enlargement rests, as his petition informs us, on the fact that, in August, 1862, he put in a substitute, who was over thirty-five years of age, and who was accepted, and he (Armistead) discharged. The petition does not aver, that the substitute was over forty years old when the writ of *habeas corpus* was applied for. The application was made January 27, 1863,—after the passage of the amendment to the conscript law of September 27, 1862, and after the call of the president for all up to the age of forty who were not legally exempt. We suppose, from the silence of the petition, that the substitute was in fact under forty years of age ; and that the real controversy between Mr. Armistead and the enrolling officer, grows out of a difference of opinion between them, as to the effect of the president's call for conscripts up to the age of forty, on those persons who had previously obtained their discharge by putting in substitutes who were, at the time of the second call, liable to do military service on their own account, being within the then conscript age. Supposing this to be the main question in the cause, and entertaining, as we do, a deliberately formed opinion upon it, with which we are satisfied, we will proceed to announce it for the guidance of the present trial, and for others similarly circumstanced.

What, then, is the effect upon the principal of the en-

largement of the conscript age, so as to embrace within its scope the substitute on whose account the principal had obtained his discharge? The conscript law (section 9) declares, " that persons not liable for duty, may be received as substitutes for those who are, under such regulations as may be prescribed by the secretary of war." Stat. at Large, 1st session of 1st Congress, p. 31. This clause of the statute applies equally to conscripts called for under the second conscript law, which is but an amendment to the first.—Stat. at Large, 2d sess. 1st Congress, 61. The regulations prescribed by the war department for carrying into effect the conscript laws, so far as they affect the question in hand, are found in general orders of the year 1862, Nos. 29, 30, 37, and 64. General order No. 29, of date April 26, 1862, and general order No. 30, of date April 28, provide the rules for reporting, examining, receiving, and mustering in the substitute, and for discharging the principal. General order No. 37, of May 19, 1862, after copying the first exemption statute, and specifying certain exempts from military service, contains this clause: "IV. No persons, other than those expressly named, or properly implied in the above act, can be exempted, except by furnishing a substitute exempt from military service, in conformity with regulations already published, (general orders No. 29;) and such exemption is valid only so long as the said substitute is legally exempt." General order No. 64, September 8, 1862, contains this clause: "A substitute becoming liable to conscription, renders his principal also liable, unless exempt on other grounds."

Three decisions have been brought to our notice, pronounced on applications similar to that of Mr. Armistead: One in the matter of *Cohn*, made by Judge McGRATH, of the district court of South Carolina; a second, in the matter of *Underwood and Allen*, made by Judge JONES, of the district court of Alabama; the third, in the matter of *Irvin*, made by C. J. PEARSON, of the North Carolina supreme court. Each of the opinions delivered in these causes ignores general order No. 37, of May 19; and

neither Judge Jones nor Chief-Justice Pearson makes any allusion to general order No. 64, of September 8. We must suppose their attention was not directed to these orders. Judge McGrath makes some allusion to general order No. 64; but he treats it, not in its legislative, or prospective feature, but in its judicial, or retrospective bearings. He announced the opinion, that it was within the power of congress, or the president, to call into the military service those who had been discharged on putting in substitutes; but that the secretary of war could not do so. These three decisions are rested, mainly, on the constructions which the learned judges delivering them place on the two conscript laws of April 16, and September 27, 1862.

The line of argument employed in these several opinions is not precisely the same; but in the points actually decided, there is a substantial conformity. The following propositions, it is believed, express the principles on which each of them rests, with sufficient accuracy to do the authors of them no great injustice: *First*, That the petitioners, by putting in substitutes, had obtained discharges under the act of April; *Second*, That the act of September placed in the army only those persons who are between the ages of thirty-five and forty-five, and, consequently, did not put into the army the petitioners, who were under thirty-five: *Third*, That the act of September was passed to call into service persons within the specified age, who were *out* of the service—not those who were *in*, as the substitutes were; and that congress cannot be supposed to have intended that the substitutes should be mustered out of the service, that they might be again mustered in as conscripts, in order thereby to reach the principals who put in those substitutes.

To each and all of these propositions, as expressed, we unhesitatingly assent. The conclusion drawn from them is not so clear. But, what is meant by the idea expressed in these opinions, that the substitute is not to be mustered out of the service, that he may be again mustered in as a con-

script? Is it intended thereby to combat an argument, leading to revivor of the principal's liability to military service under general order No. 64, provided the substitute is under forty? If such be the argument, we think it entirely misconstrues the language of general order No. 64; viz., "A substitute becoming liable to conscription, renders his principal also liable, unless exempt on other grounds." It does not mean that the substitute shall be in fact conscribed. The language will not admit of such construction, without great violence to its terms. The object of the regulation was not to place the substitute in the army; he was already in. The purpose was to declare the effect and scope of the exemption which the principal should enjoy, as the result of putting in a substitute. Its operation was upon the principal; but the event or contingency, on which its operation depended, pertained to the substitute. "Becoming liable to conscription," must mean that, in consequence of a change of the law, or of the *status* of the substitute, he comes within the age or description of persons liable to do military service on their own account. He cannot perform double service; and being liable to serve on his own account, he ceases to be a valid substitute for another. He has then become *liable to conscription.*

The true construction of the statute and general order is, that persons under thirty-five years of age, who put in substitutes between the ages of thirty-five and forty, are, in consequence thereof, exempt from military service, only until the substitute, by a change of the conscript age, or other circumstance, is embraced within the terms of the call. The principal then becomes again liable to serve in his own place; not under the act of September, but under the act of April, from which service he had enjoyed a temporary and defeasible exemption.

What we have said above is in reply to a supposed argument, based on general order No. 64. That order was issued on the 8th September, a month or more after Mr. Armistead claims to have put in his substitute. We need

not, and do not, decide whether that order was intended to operate retrospectively, or only upon substitutions perfected after that time. Mr. Armistead's case is clearly covered by general order No. 37, of May 19, copied above; for his substitute was put in in August, more than two months after that order was issued. The statute, in conferring the privilege of putting in substitutes, provided that it should be "under such regulations as may be prescribed by the secretary of war." Substitution is not, *per se*, a right: it is a boon—a privilege conferred. Congress, in granting it, was authorized to clog it with conditions; and it did so. It cannot be claimed, without a compliance with the regulations issued from the war department; and these regulations may be changed from time to time. The orders of 26th and 28th April—Nos. 29 and 30—contain no such clause as that found in the order of 19th May. Perhaps that subject was not thought of when the orders of April were issued. The order of May is too clear to admit of a cavil or doubt. It provides, that the exemption obtained on putting in a substitute, "is valid only so long as the substitute is exempt." This regulation, being made pursuant to authority conferred by congress, has the binding efficacy of law. It was part of the public law when Mr. Armistead put in his substitute, and therefore became part and parcel of the act done. He cannot complain of a breach of governmental faith, for he is charged with a knowledge of the terms on which his substitute was received. Neither can it, with any plausibility, be contended, that the order of 19th of May, declaring when the exemption shall expire, must be restricted in its operation to a certain limited number of contingencies, on the happening of some one of which the exemption of the principal shall cease. The language is as broad as it can be expressed—"*only so long as the said substitute is legally exempt.*" If under forty, he ceased to be legally exempt when the call was made for conscripts up to that age; and Mr. Armistead's exemption, by reason thereof, then ceased to be valid.

We might add to this argument, but do not perceive how we could make it clearer. It is one of those plain propositions which, in our conception, scarcely leaves any field for argument. Its strength lies in the statement of it.

The supreme court of the State of Georgia, on the application of *Farrell and Williams*, has recently had this subject under discussion, and has placed the same construction which we do on the order of May 19, 1862.

We need not, and do not, decide whether general order No. 37 retroacts on cases of substitution which were consummated before it was issued. No case of that kind has come before us, and we reserve our opinion until the question is properly presented.

It may not be improper to add, that this part of the opinion is concurred in by the entire court.

A. J. WALKER, C. J.—In Ex parte *Hill*, at the last term, I delivered an opinion, denying the jurisdiction of a State judge to discharge, on *habeas corpus*, one who had been enrolled as a conscript, upon the ground of his exemption from conscription. Neither subsequent reading and reflection, nor the opposing arguments of other judges, have changed my convictions. The question again arises in these cases; and I embrace the opportunity which is thus afforded, to fortify and extend my former argument. In doing so, I shall avoid, as far as possible, a repetition of what I have heretofore said. I therefore refer to my opinion in Ex parte *Hill*, in re *Willis* et al., which must be read in connection with this, in order that the entire argument may be understood.

While the State courts have a concurrence of jurisdiction with the courts of the general government, where there is no legislative exclusion, over most subjects cognizable in the latter tribunals, this concurrence is not universal. The line of division between the concurrent and exclusive jurisdiction of the courts of the general government is not distinctly and clearly defined. I refer to discussions upon that subject, without comment, as my argument does not

require that I should attempt to deduce from the authorities any general rule, which will govern in all cases the question of concurrence or exclusiveness of jurisdiction.— 1 Kent's Com. (m. pp.) 395 to 401; *Martin v. Hunter,* 1 Wheat. 304; *Houston v. Moore,* 5 Wheat. 1; *Teal v. Felton,* 12 How. 284. I adopt, with a modification as to the name of the government, the following language of Judge Story: "It would be difficult, and perhaps not desirable, to lay down any general rules in relation to the cases in which the judicial power of the courts of the United States is exclusive of the State courts, or in which it may be made so by congress, until they shall be settled by some positive adjudication of the supreme court. That there are some cases, in which that power is exclusive, can not well be doubted; that there are other cases, in which it may be made so by congress, admits of as little doubt; and that in other cases, it is concurrent in the State courts, at least until congress shall have passed some act excluding the concurrent jurisdiction, will scarcely be denied."— 2 Story's Com. on the Constitution, § 1754.

The concurrence of jurisdiction in the State courts, over subjects falling within the judicial power of the Confederate States, is subject to exception. The judicial power of our general government extends to all cases arising under its constitution and laws. I maintain, that so much of that jurisdiction as is exercised in the application of judicial correctives to the irregularities and errors of the executive officers of that government, charged with the enforcement of the conscript law, is necessarily exclusive; and that such officers, when acting within the limits of their authority, can not be interfered with by a State court, although they may commit errors. As the government, in the execution of the conscript law, reaches and affects the persons of its citizens; and as any irregularity or error of the officers must wrongfully infringe the liberty of the citizen, the corrective must be obtained through a writ of *habeas corpus,* operating upon the erring officer. The proposition which I maintain, leads, therefore, directly to

the assertion, that the erroneous action of such officer, within the limits of his authority, or the incorrectness with which he discharges his duty, although injuriously affecting the liberty of the citizen, may be corrected by a Confederate, but not by a State court, through the instrumentality of the writ of *habeas corpus.*

The constitution bestows upon the government, not only the power of making laws, but the power of executing them. It prescribes that the president " shall take care that the laws be faithfully executed." Under the old articles of confederation, which preceded the constitution of the United States, the important powers of the government were executed through the agency of the States. The clause of the constitution above stated remedies that defect in the old system, and gives to the government authority to act directly upon individuals in the execution of its powers.—Federalist, XV. pp. 65 to 71 ; Calhoun on the Government and Constitution of the United States, 168. The constitutional authority to execute the law, is as ample and complete as the authority to pass it. The execution of the law must be accomplished, generally, through subordinate officers. Congress may prescribe the duties of such subordinate officers, but the constitution bestows authority to perform those duties. The constitution imposes no qualification or restriction upon this authority to execute the law. The political doctrines of secession and nullification suggest remedies for the usurpation of power, by the action of bodies representing the sovereignty of the States. The line of my argument does not touch either of those doctrines. When the government, in the exercise of its constitutional power to execute the law, through its officer, errs in the performance of its duty, and wrongfully touches the liberty or property of the citizen, the remedy by which the error may be corrected and the wrong prevented is judicial. To concede the power of a State court to apply that remedy, and thus to interfere with, and control and govern as to the manner of executing the law, is to confess that the power of execution is qualified and restricted

to such mode and to such line of conduct as a State judge may approve. This power of executing the law is delegated by all the States, for their common good; and it would be a usurpation for the judge of one State to assume to control the government in the exercise of that power. If such control can be exerted by the judge in one State, it might result, that a power conferred for the good of all, when performed in a manner approved by the judges of all the States except one, would be thwarted by the interference of the judge in the single State who differed in opinion from the judges in the other States. The States gave the power, without qualification. This gift is the surrender of all right to control the government in the exercise of it.

I do not say that congress can abridge or qualify the jurisdiction of the State courts. The want of authority in the State tribunals, to supervise and control the executive officers of the Confederate States, in the exercise of their appointed functions, by the writs of injunction, replevin, *habeas corpus*, or other process, results from the delegation in the constitution of an unqualified power to execute the laws which congress may enact, and not from any denial of such authority by act of congress. If a State court can not correct, under a writ of *habeas corpus*, the errors of the enrolling officers engaged in enforcing the law of conscription, it is because the constitution bestows the power to execute the law without any qualification that it shall be done in a manner consistent with the judgment of a State judge, and not because congress has suspended, or can suspend, the writ of *habeas corpus*.

The constitutional power of executing the laws of congress, whether they touch the person or the property of the citizen, can not be subordinated to the authority of a State tribunal, by its supervision and control of the conduct of the executive officers acting within the area of their jurisdiction. This is an inevitable deduction from the proposition, that the general-government is, within the sphere of its delegated powers, co-ordinate with the

respective States, and their equal; and that, within the area of its appointed attributes, its authority is as paramount as that of the States within the boundary of the powers not delegated nor surrendered. No ingenuity can successfully controvert this proposition. It rests for its basis upon the unqualified character of the grants of authority by the constitution. It has the repeated sanction of Mr. Calhoun, who, for years, applied his logic and learning to the investigation of the relations of the States with the government of the United States; who stood, in life, the vigilant guardian of the rights of the States, and a foe to the encroachments of the Federal government; and who, dying, has left in his "Discourse on the Constitution and Government of the United States," his views as matured by experience and protracted application to the subject. From this posthumous work I make the following extract:

"The government of the States sustained to the former [the confederacy which preceded the constitution of the United States] the relation of superior to subordinate,—of the creator to the creature; while they now sustain to the latter [the government of the United States] the relation of equals, or co-ordinates. Both governments—that of the United States, and those of the separate States—derive their powers from the same source, and were ordained and established by the same authority; the only difference being, that in ordaining and establishing the one, the people of the several States acted with concert, or mutual understanding; while in ordaining and establishing the others, the people of each State acted separately, and without concert or mutual understanding, as has been fully explained. Deriving their respective powers from the same source, and being ordained and established by the same authority, *the two governments, State and Federal, must, of necessity, be equal in their respective spheres;* and both being ordained and established by the people of the States respectively, *each for itself,* and by its own separate authority, the constitution and government of the United States must, of necessity, be the constitution and government of each, as

much so as its own separate and individual constitution and government; and therefore they must stand, *in each State, in the relation of co-ordinate constitutions and governments*."—Pages 166–167.

"It is obvious from this sketch, brief as it is, taken in connection with what has been previously established, that the two governments, general and State, stand to each other, in the first place, in the relation of parts to the whole; not, indeed, in reference to their organization or functions, for in this respect they are perfect; but in reference to their powers. As they divide between them the delegated powers appertaining to the government, and *as of course each is divested of what the other possesses*, it naturally requires the two united to constitute one entire government. *That they are both paramount and supreme within the sphere of their respective powers, that they stand within those limits as equals*, and sustain the relation of co-ordinate governments, has been fully established. As co-ordinates, they sustain to each other the relation which subsists between the different departments of government—the executive, the legislative, and the judicial, and for the same reason. These are co-ordinates, because *each, in the sphere of its powers, is equal to, and independent of the others*, and because the three united make the government. The only difference is, that, in the illustration, each department by itself is not a government, since it takes the whole in connection to form one; while the government of the several States respectively, and that of the United States, although perfect governments in themselves, and in their respective spheres, require to be united, in order to constitute one entire government. They, in this respect, stand as principal and supplemental, while the departments of each stand in the relation of parts to the whole."—Pages 197–198.

"That they are both governments, and as such possess all the powers appertaining to government, within the sphere of their respective powers—the one as fully as the other—can not be denied."—Page 241. See, also, pages 225, 242, 243, 252, 253.

31

The preamble to the constitution of the United States represents that instrument to be ordained and established by "the people of the United States." The preamble to the constitution of the Confederate States represents it to be ordained and established by "the people of the Confederate States, each acting in its sovereign and independent character." The latter is precisely what Mr. Calhoun construed the former to be.—Discourse on Con. and Gov. of U. S., p. 128. The pertinency of Mr. Calhoun's observations to the question in hand is, therefore, not affected by the difference in language just noticed.

Under our compound system of government, the general government and the States are the peers of each other; and the authority of each, within the scope of its powers, is paramount over the other. To each there is a like negation of right to control the other in the exercise of its authority. The State can no more control the general government in the exercise of its powers through its appointed agents, than can the general government control the States in the exercise of their respective powers. The courts of the general government are limited in their jurisdiction. Aside from this consideration, and as a mere question of governmental power, the State tribunals can no more release from the custody of the executive officers of the general government one taken as a soldier, because, in the judgment of such tribunal, such person was not within the operation of the act of congress, than could a tribunal of the general government take from the custody of a State officer one taken as a State soldier, because, in its judgment, such person was not within the operation of the act of the State legislature. This must be so; otherwise, the two governments are not co-ordinate or equal.

Chief-justice Taney, speaking the unanimous opinion of the judges of the supreme court of the United States, but carried the propositions of Mr. Calhoun to their obvious and necessary result, when, in the case of *Ableman v. Booth*, (21 How. 516,) he penned the following sentence: "The powers of the general government and of the States, al-

though both exist, and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres; and the sphere of action appropriated to the United States is as far beyond the judicial process issued by a State judge, as if the line of division was traced by landmarks and monuments visible to the eye." While this sentence has been criticised for even its guarded application of the term *sovereignty* to the government of the United States, it is, in its substance and its import, but the embodiment of a great principle, obviously deducible from the teachings of Mr. Calhoun.

The principle for which I contend, is not only sustained by reasoning drawn from the relation of the governments, State and Confederate, to each other, but is established by judicial precedents, which every lawyer is bound to respect, if not to obey. The embargo act of 1808 authorized collectors of customs to detain *vessels*, whenever in their opinion there was an intention to violate the provisions of the act; but it was silent as to the cargo. A vessel and *its cargo* having been detained, Chief-justice Marshall held, that an action could be maintained in a State court for the recovery of the *cargo*, because the act of congress gave no right of seizure or detention as to it; but that an action for a vessel tortiously seized could only be brought in the Federal courts; and that the officer having a right to seize for a supposed forfeiture, the question, whether that forfeiture had been actually incurred, belonged exclusively to the Federal courts, and could not be drawn to another forum.—*Slocum v. Mayberry*, 2 Wheaton, 9. The opinion says: "Had this action been brought for the vessel, instead of the cargo, the case would have been essentially different. The detention would have been by virtue of an act of congress, and the jurisdiction of a State court could not have been sustained. But the action having been brought for the cargo, to detain which the law gave no authority, it was triable in the State court."

If there were no law authorizing conscription, and yet a

citizen had been conscribed into the army, a case would be presented analogous to that over which the jurisdiction of the State tribunal was maintained in *Slocum v. Mayberry.* The case actually presented is one where there is a law authorizing conscription, and it is alleged that the proper officer has erred in the execution of the law, and wrongfully taken a citizen. The case is strictly analogous to that of which, it is declared, the State court has no jurisdiction. It is analogous to the case which would have been presented, if a collector of customs, authorized to seize vessels characterized by an intent to violate the law, had erred, and seized one not so characterized. In reference to such a case, the opinion above referred to declares, that the question whether the forfeiture has actually been incurred, belongs exclusively to the Federal courts, and can not be drawn to another forum; and that it depends upon the final decree, whether the seizure shall be deemed rightful or tortious. So, in the case in hand, the act of congress empowers the officer to conscribe persons characterized by certain qualities of age and capacity; and the question, whether the persons conscribed possess those qualities, belongs, so far as the control of the officer is concerned, exclusively to the Confederate courts, and can not be drawn into another forum.

By the supreme court of the United States, it has been held, that a *mandamus,* to compel the register of a land-office to perform an official duty as to an entry of the public land, could not be issued by that court, because it could not exercise original jurisdiction over such a subject. It was held, also, that the writ for such purpose could not be issued by the circuit court of the United States, notwithstanding the judicial power of the United States under the constitution extended to such a case. This latter decision is put upon the reason that, congress had not, by the judiciary act, delegated the judicial power of the government to control the register of the land-office by *mandamus.* Although it thus resulted, that no judicial tribunal of the United States, under the existing legislation, could give to

an injured party redress, by compelling an officer to permit an entry of land, it was decided, that a State court had no jurisdiction over the subject, and an attempt to exercise it was rebuked, as "an instance of the growing pretensions of some of the State courts over the exercise of the powers of the general government."—*McIntyre v. Wood*, 7 Cranch, 504; *McClung v. Silliman*, 2 Wheat. 369; *McClung v. Silliman*, 6 Wheaton, 598. See, also, *Marbury v. Madison*, 1 Cr. 137; *Lytle v. Arkansas*, 22 How. 193; *Barnard v. Ashley*, 18 How. 45. The question is the same, whether the injury results from an error of omission or commission; and the principle which governs in the former case, must apply in the latter. Other cases of like character are collated by Chancellor Kent in his Commentaries, as will be seen by reference to an extract from that work made in my former opinion.

The principle which I assert is most clearly sustained and forcibly illustrated by the cases growing out of the fugitive-slave law. The act of 1850 authorized the reclamation of fugitive slaves by the procurement of a warrant from a commissioner, or by seizing and taking the fugitive before a comissioner, whose duty it was to grant a certificate, authorizing his removal to the State from which he escaped.—Brightley's Digest, 296, § 8. The proceeding before the commissioner, under that law, was summary, and *ex-parte*, and might be based upon affidavit made in the State from which the fugitive escaped. The courts of the United States held, that a State court had no power to interfere with the owner or marshal engaged in executing that law; and the South applauded the decisions, as asserting the only principle by which an execution of the law could be had in a community made, by fanatical opposition to slavery, unmindful of constitutional duty. The principle asserted in those cases, arising from the fugitive-slave act, is identical with that which I am endeavoring to maintain. It is a well established doctrine, that where two courts have concurrent jurisdiction, the exercise of the jurisdiction by one of the courts ousts the authority of the

other. It is admitted, therefore, that the denial to a State court of jurisdiction as to a particular subject, over which a Federal court has commenced to exercise its authority, affords no argument against the existence of a concurrence of jurisdiction. If, therefore, it were true that the commissioner, in issuing a warrant for the seizure of a fugitive slave, acted as a court, and exercised a part of the judicial power of the United States, the negation of all authority in the State courts to interfere with the execution of the process might be referred to the doctrine just stated. But the commissioner who issued a warrant for the seizure of a fugitive slave, did not act as a court, or exercise judicial authority. His authority was in its nature judicial, or *quasi*-judicial, as contradistinguished from judicial authority. It is precisely the character of authority which the enrolling officer exercises under the conscript law, when he determines the question of liability to conscription.

Chief-Justice PEARSON, of North Carolina, in the matter of *Bryan*, before the supreme court of that State, argued against the proposition, that the officer executing the conscript law exercised *quasi*-judicial power, upon the ground that the vesting of such authority in an officer would break down the distinction, which the constitution carefully draws, between the executive and judicial departments of the government. In this argument, it seems to me, the learned chief-justice overlooks the difference between judicial authority, and that which is *quasi*-judicial, or merely judicial in its nature. The bestowment of any part of the judicial authority of the United States, upon an officer appointed and qualified as were the commissioners who were empowered to issue warrants for the seizure of fugitive slaves, and to authorize their return to the States from which they escaped, would have infringed the provision of the constitution which prescribes the mode of appointing judicial officers, and their tenure; and the proceedings before such commissioners would probably have been violative of the constitutional provision on the subject of jury trials. The constitutionality of the fugitive-slave law can

only be maintained upon the ground, that the commissioner is not a judicial officer, and does not exercise judicial power.    Upon that ground, it has been maintained by the courts of the United States, and by some of the State courts.—*Prigg v. Commonwealth*, 16 Peters, 622 ; Opinion of Judge Cheves, of South Carolina, in *Rhodes' case*, 12 Niles' Register, 264; Charge of Judge Nelson to the grand jury for the southern district of New York, 1 Blatchford, 635, 643, 644; Ex parte *Robinson*, 6 McLean, 354, 359 ; *Sims' case*, 7 Cush. 302–303; Ex parte *Jenkins*, 2 Amer. Law Reg. 149 ; Ex parte *Gist*, 26 Ala. 156.  See, also, *United States v. Ferriera*, 13 Howard, 40, 51 ; *Gaines v. Harvin*, 49 Ala. 498.

I make the following extract from the above mentioned charge of Judge Nelson :    " It has been made a question upon this act [the fugitive-slave law], whether or not it was competent for congress to confer the power upon the United States commissioners to carry it into execution. As the judicial power of the Union is, by the constitution, vested in the supreme court, and in such inferior courts as congress may from time to time establish, the judges of which shall hold their offices during good behaviour, it has been supposed that the power to execute the law must be conferred upon these courts, or upon judges possessing this tenure.    It is a sufficient answer to this suggestion, that the same power was conferred upon the State magistrates by the act of 1793 ; and which, in *Prigg v. Commonwealth of Pennsylvania*, was held to be constitutional, by the only tribunal competent under the constitution to decide that question.    *    *    *.  The judicial power mentioned in the constitution, and vested in the courts, means the power conferred upon courts ordained and established by and under the constitution, in the strict and appropriate sense of that term—courts that compose one of the three great departments of the government, prescribed by the fundamental law, the same as the other two, the legislative and the executive.    But, besides this mass of judicial power belonging to the established courts of a government,

there is no inconsiderable portion of power in its nature
judicial—*quasi*-judicial—invested, from time to time, by
legislative authority, in individuals, separately or collect-
ively, for a particular purpose and limited time. This
distinction in respect of judicial power will be found run-
ning through the administration of all governments, and
has been acted upon in this since its foundation. A famil-
iar case occurs in the institution of commissions for settling
land claims, and other claims against the government. *
The same answer may be given, also, to the objection
founded upon the seventh amendment of the constitution,
which provides that, in suits at common law, where the
value in controversy shall exceed twenty dollars, the right
of trial by jury shall be preserved. * * * * The pro-
ceeding contemplated by the clause of the constitution in
question, is not a suit at common law within the meaning
of that amendment. It settles conclusively no right of the
claimant to the service of the fugitive, except for the pur-
pose of removal to the State from which he or she fled ; no
more than the proceeding in the case of a fugitive from
justice, for the purpose of his removal, settles his guilt.
The question of right to the service in the one case, and of
guilt in the other, is open to a final hearing and trial in
the States whence the fugitives escaped."

Language equally pointed and clear will be found by
reference to the other authorities above referred to. Our
own court, in *Gaines v. Harvin*, (*supra*,) used the following
language : " We not understand by this provision in the
constitution, that it was the intention of its framers to deny
to the legislature the power to confide to ministerial offi-
cers, who do not constitute a part of the judiciary prop-
erly so called, many duties involving inquiries in their
nature judicial. The practice of this, as of all other
governments having their executive, judicial, and legislative
departments separate and distinct, very clearly shows that,
in the administration of the laws, inquiries partaking of the
nature of judicial investigations are confided to persons
other than judges, whose acts have never been questioned

on constitutional grounds.   Auditors and commissioners appointed in certain cases, and for specific but temporary purposes ; commissioners of roads and revenue, or for the allotment of dower ; the sheriff, in executing writs of inquiry in certain cases ; so, also, the masters in chancery, the commissioner of patents of the United States, and commissioners under the late act of congress in regard to the extradition of fugitive slaves, all perform duties in their nature judicial ; but we have seen no case holding their acts to be unconstitutional."

If it were true, as argued by Chief-Justice PEARSON, that to confer on the secretary of war and his subordinates the power of determining who is liable to conscription, would be " totally at variance with every principle of our government," then the fugitive-slave law, in its bestowment of power upon the commissioners, violated the constitution ; and the law investing the registers of the land-offices, and every department of the government, with *quasi*-judicial power, is unconstitutional.   The authorities which I have cited, as well as those from which I have made extracts, fully illustrate and sustain the distinction which I have drawn, and I need not further discuss the point.   I think it can not be controverted, by any one who respects judicial precedents and fair argument, that the commissioner who issued a warrant for the arrest of a fugitive slave, was no judge, held no court, did not exercise judicial authority, issued no process returnable to a court, and really put forth no judicial process ; notwithstanding, in the careless use of language, his process may have been so characterized. The commissioner was as much a ministerial, or executive officer, as the officer charged with the execution of the conscript law ; and their powers are alike *quasi*-judicial, as distinguished from judicial, in their character.   Upon what ground, then, can it be maintained, that the State courts can interfere with the execution of the conscript law, and yet were without power to interfere with the enforcement of the fugitive-slave act ?

I proceed to notice some of the decisions and rulings

made in the non-slaveholding States by the judges who were endeavoring to maintain the supremacy of the constitution and laws of the United States, opposed and resisted with a boldness and ingenuity without a parallel in the history of the country. Judge Nelson, of the supreme court of the United States, in the charge to the grand jury already referred to, used the following language: "There have been different opinions entertained by the judges of the States, as to their power under this writ [the writ of *habeas corpus*] to decide upon the validity of a commitment or detainer by the authority of the United States. But those who have been inclined to entertain this jurisdiction admit that it can not be upheld, where it appears from the return that the proceedings belonged exclusively to the cognizance of the general government. This necessarily results from the vesting of the judicial power of the Union in the Federal courts and officers, and from the fourth article of the constitution, which declares that "the constitution, and laws of the United States, which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every State shall be bound thereby, any thing in the constitution or laws of any State to the contrary notwithstanding." If the exclusive power to execute the law is in the Federal judiciary, and the act is to be regarded as the supreme law of the land, and to be obeyed as such, it is difficult to see by what right or authority its execution can be interfered with, through the agency of this writ, by State authorities. Any such interference would seem to be a direct infraction of the constitution. It is proper to say, in order to guard against misconstruction, that I do not claim that the mere fact of the commitment or detainer of a prisoner by an officer of the Federal government bars the issuing of the writ, or the exercise of power under it. Far from that. Those officers may be guilty of illegal restraints of the liberty of the citizen, the same as others. The right of the State authorities to inquire into such restraints is not doubted; and it is

the duty of the officer to obey the authority by making a return.    All that is claimed or contended for is, that when it is shown that the commitment or detainer is under the constitution, or a law of the United States, or a treaty, the power of the State authority is at an end, and any other proceeding under the writ is *coram non judice* and void.    In such a case—that is, when the prisoner is in fact held under process issued from a Federal tribunal, under the constitution, or a law of the United States, or a treaty—it is the duty of the officer not to give him up or allow him to pass from his hands at any stage of the proceedings."

Judge McLean, one of the judges of the supreme court of the United States, in reference to a case where a Kentuckian, the owner of slaves, seized then in Michigan without a warrant, held, that the owner having a warrant issued by a commissioner, or having seized his slaves in the absence of a warrant without a breach of the peace, upon the return of either of those facts, the authority of the State court under a writ of *habeas corpus* would cease, because it would then appear that the prisoner was held under the authority of the constitution and laws of the United States. *Norris v. Newton*, 5 McLean, 82.

A case is reported in 5th Am. Law Reg. 659, September, 1857, (Ex parte *Sifford Marshall, et al.*,) which was decided in an able opinion by Judge Leavitt in the district court of Ohio.    In that case, some persons had resisted the marshal in the arrest of a fugitive slave.    Those persons were arrested under a warrant upon the charge of resisting the officer.    An attempt was made to take the prisoners out of the custody of the marshal by virtue of a writ of *habeas corpus* issued by a State judge.    For an assault and battery committed in resisting this attempt, the marshal and his posse were arrested under a warrant issued by a justice of the peace. A *habeas corpus* was obtained from the district judge ; and he, in passing upon the power of a State court to interfere with the custody of prisoners held by the marshal under a warrant, used the following language :  " The doctrine seems now to be settled, that a State judge has no jurisdic-

tion to issue a writ of *habeas corpus* for a prisoner in the custody of an officer of the United States, if the fact of such custody is known to him before issuing the writ. And it it well settled, that if, upon the return of the writ, it appears the prisoner is in custody under the authority of the United States, the jurisdiction of the State judge is at an end, and all further proceedings by him are void." The same judge, in an opinion of great ability in another case, in 1856, after examining the authorities, held as follows : "If judicial decisions are entitled to any consideration, it is clearly established that, though it may be competent for a State judge to issue the writ of *habeas corpus* in a case of imprisonment under the authority of the law of the United States, when the fact is made known to him his jurisdiction ceases, and all subsequent proceedings by him are void."—Ex parte *Robinson*, Am. Law Reg. for August, 1856, vol. 4, p. 617 ; Ex parte *Robinson*, 6 McLean, 35.

In the celebrated *Sims* case, (7 Cush. 285,) the supreme court of Massachusetts declined to issue a writ of *habeas corpus* for a fugitive slave, claimed in the petition to be free, who had been arrested under a warrant issued by a commissioner. The court, in an opinion delivered by Chief-Justice Shaw, while admitting the general proposition, that a State court "can not issue a writ of *habeas corpus* to bring in a party held under color of process from the courts of the United States, or whose services and the custody of whose person are claimed under authority derived from the laws of the United States," denies the universality of the proposition, and instances the cases of soldiers and sailors held by military and naval officers under enlistments complained of as illegal and void, as exceptions. The distinction intimated can only be maintained upon the supposition, that the principle involved would yield at the judicial will to suit the wants of the case.

Finally, the subject was presented to the supreme court of the United States, in the two cases of *Ableman v. Booth*, and *The United States v. Booth*, in which Chief-Justice Taney delivered the opinion of the court, which is reported

in 21 Howard.   In one of those cases, the Wisconsin court discharged Booth from imprisonment under a commitment by a commissioner for resisting the execution of the fugitive-slave law.   In the other, the court of the same State discharged the same person from imprisonment under a judicial conviction for the same offense.   The supreme court of the United States, as will be seen by reference to pp. 523–524, placed its decision upon the ground, that a State court can not interfere with the custody of one held under the authority of the United States.   After conceding the right of a State court to ascertain by what authority a prisoner within the confines of its territorial jurisdiction is held, the court uses the following emphatic language : " But after the return is made, and the State judge or court judicially apprised that the party is in custody under the authority of the United States, they can proceed no further. They then know *that the prisoner is within the dominion and jurisdiction of another government, and that neither the writ of habeas corpus, nor any other process issued under State authority, can pass over the line of division between the two sovereignties.*   He is then within the dominion and exclusive jurisdiction of the United States.   If he has committed an offense against their laws, their tribunals alone can punish him.   If he is wrongfully imprisoned, their judicial tribunals can release him, and afford him redress.   And although, as we have said, it is the duty of the marshal, or other person holding him, to make known by a proper return the authority under which he detains him, it is at the same time imperatively his duty to obey the process of the United States, to hold the prisoner in custody under it, and to refuse obedience to the mandate - or process of any other government.   And consequently it is his duty not to take the prisoner, nor suffer him to be taken, before a State judge or court, upon a *habeas corpus* issued under State authority.   No State judge or court, after they are judicially informed that the party is imprisoned under the authority of the United States, has any right to interfere with him, or require him to be brought before them.   And if the

authority of a State, in the form of judicial process or otherwise, should attempt to control the marshal, *or other authorized officer or agent* of the United States, in any respect, in the custody of his prisoner, it would be his duty to resist it, and to call to his aid any force that might be necessary to maintain the authority of law against illegal interference. No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing less than lawless violence."

It has been objected to the authority of this opinion, first, that the court and the great jurist who delivered it did not really mean what is said; and secondly, that it must at all events be treated as an *obiter dictum*—as the opinion of an able lawyer on a question not presented by the facts before the court. In reply to the former objection, I have only to say, that when the case of *Ableman v. Booth* was decided, the supreme court of the United States, with its nine judges, in the high qualities of lofty integrity and profound learning, had no superior, if it had an equal; and it is inconceivable that the language of so important an opinion should have obtained the unanimous sanction of such a tribunal, unless it afforded a true index to its opinions. The second objection is as groundless as the first. The decision of the case in which there had been a conviction and a sentence, might have been put upon the principle, that the judgments of judicial tribunals, within the area of their jurisdiction, are conclusive. In the other case, where there was simply an arrest and commitment by authority of a commissioner, that proposition would not have decided the case; for the authorities hereinbefore cited show, that it is now the established doctrine, however much it may have been controverted in the past, that the commitment of one to answer before a court for an offense does not involve the exercise of judicial power. Although an offender may have been committed by a commissioner, to answer a charge, the truth of

the accusation may be investigated on *habcas corpus* issued
by a judge of a Federal court, and also by a State judge,
if he has a concurrence of jurisdiction.—See, particularly
the opinion of Judge Grier, in the case of *Jenkins and
Crosson*, reported in the Amer. Law Reg. for January,
1854, p. 144. In order to cover both cases, it was, there-
fore, necessary for the supreme court of the United States
to find some broader principle; and it seems to me that
they have laid down the only principle which could have
controverted the State jurisdiction in both cases.

But it may be said, that the court should have restricted
its doctrine to the very facts of the case, and, instead of
announcing the broad and comprehensive principle, that
the jurisdiction of the general and State governments are
as distinct as if separated by visible marks—that neither
can cross the line which divides their jurisdictions, and
that, therefore, a State tribunal can not interfere with the
custody of one held under the authority of the United
States—should have emasculated the principle, by adding
the proviso, that its application should be confined to cases
of imprisonment under the warrant of a commissioner, or
under a conviction in a Federal court. It is not right to
denounce the statement of a principle as an *obiter dictum*,
because it is large enough to cover other cases than those
decided. To do so, would banish from the bench the
assertion of those comprehensive and leading doctrines
which give stability and harmony to jurisprudence, and
require the judicial mind always to present principle nar-
rowed down by the facts of the particular case, and there-
fore unfitted to be a rule of conduct in the affairs of life.
The great doctrine stated by the supreme court of the
United States was applicable to the cases decided, and con-
trolled their decision. It is, therefore, not an *obiter dictum*.

As the result of my long review of the decisions grow
ing, directly and indirectly, out of the fugitive-slave law,
I confidently assume, that the principle which I have as-
serted is fully supported by them, and that it has the sanc-
tion of the supreme court of the United States, which,

under the old system of government, would have been a commanding authority. I admit, as I have heretofore done, that many State decisions—in New York, New Hampshire, Massachusetts, Pennsylvania, Maryland, and Virginia— maintained the power of State courts to interfere with the custody of persons held under the authority of the United States. Many of those cases are noticed in my former opinion, and they are collated by Hurd in his work on Habeas Corpus. All the State courts did not decide the same way. The question seems to have been decided both ways in Georgia. So, also, the decisions were contradictory in South Carolina.—*Rhodes' case*, 12 Niles' R. 264; *In the matter of Merritt*, 5 Amer. Law Journal, 497. In the former of those cases, Judge Cheves delivered an able opinion, controverting the State jurisdiction. In the latter, Judge Nott recognized the jurisdiction, without noticing the point. So, also, in North Carolina, the jurisdiction was exercised without any notice or discussion of the question.—Ex parte *Mason*, 1 Mur. 326. In New Jersey, Judge Southard, speaking for the court, avoids the question of jurisdiction; but for himself remarks, that it would require a "great struggle of feeling and judgment for him to ever arrive at the point where he would be prepared to deny the State jurisdiction."—*State v. Brearly*, 2 Southard, 555.

In the Federal courts, the jurisdiction of the State courts was never acknowledged. In *Veremaitr's case* it was expressly denied.—Hurd on Habeas Corpus, 197. In the case of *Keeler*, (Hempstead's R. 306,) it was doubted, if not denied. No American law-writer has conceded the jurisdiction, except Mr. Hurd, whose book was written in Ohio, in 1858, during the struggle of the State courts, in the non-slaveholding States, to defeat the enforcement of the fugitive-slave act; and who exhibits his own proclivities, by the expression of doubts as to the constitutionality of that act—pp. 648, 649. Chancellor Kent as a judge in New York denied the State jurisdiction, and afterwards in his commentary only yielded the point to a later decision

in that State so far as to say, "the question was therefore settled in favor of a concurrent jurisdiction in that case, and there has been a similar decision and practice by the courts of other States"; but there is no evidence that he ever abandoned the views expressed by him from the bench.—*Ferguson's case*, 9 Johns. R. 239; *In the matter of Stacy*, 10 *ib.* 328; 1 Kent's Com. 401. Sergeant, in his work on Constitutional Law, (p. 283,) treats the question as unsettled, and contents himself with giving the decisions on both sides of it. In Duer's Treatise on Constitutional Jurisprudence, (p. 180,) published in 1856, the subject is thus disposed of: "Under what circumstances, and how far, the judges of the State courts have power to issue a *habeas corpus* and decide on the validity of a commitment or detainer under the authority of the national government, are questions which have been variously determined in the States, and never definitely settled in the supreme court of the United States, where the ultimate right of determining them resides." In 1842, Conkling's Treatise on the Jurisdiction of the Federal Courts issued from the press. That work, in reference to this subject, employs the following language: "Whether, and if so under what circumstances, the judges of State courts can rightfully exercise this power, are questions which have been variously decided in the courts of the several States. It seems to have been agreed on all hands, however, that, admitting the power to exist, it ought to be exercised with great caution and reserve; and among the advocates of the power it has generally been supposed, that it ought to be limited to the inquiry, whether the court or officer, in virtue of whose process or order the prisoner was confined, had jurisdiction of the case." In this unsettled condition the supreme court of the United States found the question in 1858, when it decided the case of *Ableman v. Booth.* That decision, on account of the high character for learning, integrity, and patriotism of the judges, the relation in which the court stood to other tribunals, and the sound reasoning which it developed, ought to have settled the

32

question; and in all probability the point would never again have been agitated, if we had continued to occupy our former relation to the United States. *Tempora mutantur, nos et mutamur in illis.*

Ingenuity may suggest the reply to my argument, that the conscript law bestows no authority to enroll those who are exempt for any of the reasons specified in the law; and that, therefore, the officer who visits conscription on one not liable, does not act under the authority of the government of the Confederate States. To this reply I rejoin, that there is a necessarily implied authority in the officer to determine who are amenable to conscription; for how can he enroll those liable, and exempt those not liable, without determining who belong to the respective classes? The officer, in ascertaining who are within the age of conscription, as clearly exercises an authority bestowed by act of congress, as he does in enrolling a man of undisputed liability. A youth is presented to an enrolling officer; his age is doubtful; the law commands the officer to enroll him, if he is eighteen years of age; the officer does not know whether he is of that age; must he, because he is thus uninformed, discharge the young man? He must do so, unless he has authority under the law to investigate the question of age; for, as an officer, he can do nothing for which the law does not afford a warrant. The authority to determine the question of liability to conscription is necessarily involved in the power to conscribe; for there can be no conscription without the ascertainment of its proper subjects. An officer must have the power necessary to discharge his duty. Certainly the officer may err; so may all the officers of the general government—the collector of customs, the post-master-general, the commissioner who commits persons held to have violated the criminal law, and all others who exercise powers which concern the pecuniary interest, the property, or the liberty of the citizen; yet it will scarcely be contended, that it is the province of a State tribunal to visit a controlling authority over those officers, in order to coerce the correc-

tion of their errors.   One government cannot thus control the officers of a co-ordinate government.   If it can, the two governments are not co-ordinate and equal within their proper spheres—the latter is subordinate and inferior to the former.

If the officer charged with the execution of the conscript law has no authority to decide the question of liability to conscription, it is competent for any State officer, authorized to issue a writ of *habeas corpus*, to treat every enrollment as a nullity, and to discharge every man enrolled, when in his judgment there was not a liability. The officer becomes liable to a conviction for false imprisonment, if a State court differs from him upon the question which he is bound to decide.   He may have decided and acted precisely as he thought to be right, and as the judicial tribunals of the government, whose officer he was, would approve ; and yet he may be punished as a criminal, because some judicial officer of another government entertained a different opinion.   An army raised in a particular State, and deemed liable to conscription by the executive and judicial departments of the Confederate government, and of the State where it was raised, may, upon reaching some other part of the Confederacy, find some officer, clothed by the State law with power to issue the writ of *habeas corpus*, whose peculiar views will lead him to disband the army in a day.   The tribunals of a single State, differing from those of the Confederate States and of every other State, may utterly subvert the application of the power to raise armies to that State.   They may even invite the people from other States, by peculiar rulings, to fly to their jurisdiction as a shelter from the enforcement of the law. It is to be apprehended that our government will not be permitted to pass through its infancy, without experiencing some or all of the ruinous consequences which are (as I believe) probable results of the proposition, that State courts have the jurisdiction claimed for them.

Congress has power, granted by the constitution, to suspend the privilege of the writ of *habeas corpus*, when, in

cases of rebellion or invasion, the public safety may require it.—Constitution of the United States, art. I, § 9, ¶ 2; Constitution of the Confederate States, art. I, § 9, ¶ 3. An unavoidable sequence of the proposition, that there is a concurrent jurisdiction in the State tribunals, in reference to the custody of persons held under the authority of the general government, is, that the suspension by congress applies to State courts and judges. Upon the hypothesis of the concurrent jurisdiction, the suspension would be utterly vain and nugatory, unless it affected State tribunals; for, if it were restricted to the tribunals of the general government, an applicant for relief under the writ would only find it necessary to address his prayer to a judicial officer of the State, instead of the Confederate States. I am not prepared to admit, that the framers of the constitution ever intended to subject the use of the great remedial writ of *habeas corpus* by the States, to the control of another government. *Habeas corpus* is the instrument by which the State tribunals redress wrongs, varied and extensive in their character, which cannot affect the general government, either in peace or in war, in times of domestic quietude or rebellion. I do not think that the convention which framed the constitution aimed to bestow any authority to interfere with the use of that writ by the State judges. The object of the States was to delegate only such powers as would enable the government "to do that which either could not be done at all, or as safely and well done by them as by a joint government of all." In the clause in reference to *habeas corpus*, there is a great departure from that prime object, if it be understood to apply to the employment of that writ by the State tribunals.

As the writ of *habeas corpus* was never suspended by the government of the United States before the secession of the southern States, we can find in its annals no decision upon the exact question in hand. Nevertheless, I think Chief-Justice Marshall and Chancellor Kent have announced a principle irreconcilable with the supposition that congress can suspend the issue of the writ by State judges.

The former of those two eminent jurists, in *Baron v. The Mayor &c. of Baltimore*, (7 Peters, 247,) used the following language : "The constitution was ordained and established by the people of the United States, for their own government, and not for the government of the individual States. Each State established a constitution for itself, and in that constitution provided such limitations and restrictions on the powers of its particulor government as they supposed best adapted to their situation, and best calculated to promote their interests. The powers they conferred upon the government were to be exercised by itself; and the limitations on power, if expressed in general terms, are naturally, and we think necessarily, applicable to the government created by the instrument. They are limitations of power granted in the instrument itself; not of distinct governments, framed by different persons, and for different purposes." In the same opinion, the principle is distinctly stated, that no limitation of the action of the government of the United States on the people would apply to the State governments, unless expressed in terms ; and that in every inhibition in the 9th and 10th articles of the constitution, intended to act on State power, words are employed which directly express that intent. Chancellor Kent's views upon the same subject are thus expressed : "As the constitution of the United States was ordained and established by the people of the United States for their own government as a nation, and not for the government of the individual States, the powers conferred, and the limitations on power contained in that instrument, are applicable to the government of the United States, and the limitations do not apply to the State governments except in express terms. * * The people of the respective States are left to create such restrictions on the exercise of the power of their particular governments, as they may think proper, and restrictions by the constitution of the United States, on the exercise of power by the individual States, in cases not consistent with the objects and policy of the powers vested in the Union, are expressly enumerated."—See, also,

*In the matter of Smith,* 10 Wend. 449 ; *Livingston v. Mayor of N. Y.,* 8 *ib.* 85–100 ; *Barker v. People,* 3 Cow. 636–700 ; *Murphy v. People,* 2 Cowen, 315–520 ; *Noles v. State,* 24 Ala. 672–690 ; *Boring v. Williams,* 17 Ala. 510–516.

While the provision of the constitution implies an authority to suspend the privilege of the writ of *habeas corpus,* it restricts that authority to occasions when, in cases of rebellion and invasion, the public safety may require it ; and it likewise restricts judicial authority by a prohibition to relieve under the writ, when there is a constitutional suspension. I cannot perceive how this limitation of judicial authority can, consistently with the principle stated by Chief-Justice Marshall and Chancellor Kent, be made to apply to the judicial department of the State government. A theory, which necessitates the imposition of such a restriction upon the authority and power of State judges, can not, it seems to me, be correct.

If it be understood that the State judges cannot discharge persons held under the authority of the Confederate States, perfect harmony in the operation of the two systems is preserved. Neither the States collide with the general government, when it, in the exercise of its powers, takes a person into custody ; nor the latter with the States when exercising their proper judicial functions. And the States will be left, as it was intended they should, in the undisturbed exercise of powers, extending " to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State." Federalist, No. XLV, 216.

The privilege of interfering with the general government, in the execution of its laws, is no compensation to the impaired and wounded sovereignty of the States, for the concession to another power of the authority to suspend the right of their citizens to obtain the writ of *habeas corpus* from their judges.

This question, so far as I have discovered, was noticed in only one of the State conventions, which ratified the con-

stitution of the United States. In the Massachusetts convention, Judge Sumner, discussing the clause as to the suspension of the writ of *habeas corpus*, said: " Congress have only power to suspend the privilege to persons committed by their authority. A person committed under authority of the States will still have a right to the writ." 2 Elliott's Debates, 109.

I concede, and never intended to be understood as controverting, the authority of the State courts to inquire into the cause of imprisonment of the citizens of the State. On the contrary, I hold, as do all the authorities, that a State judge ought to take jurisdiction, until he ascertains that the petitioner is held under the authority of the Confederate States; and that as soon as he is so informed, whether by the petition itself, or the subsequent proceedings, he ought to repudiate the cause.—*Ableman v. Booth, supra;* also, *Sims' case,* 7 Cush. 285; *Watkins' case,* 3 Peters, 204; Ex parte *Passmore Williamson,* Amer. Law Register for November and December, 1855, vol. 4, p. 31.

I fully concur with my brother STONE in the conclusion attained by him in the Dudley case. I concur with him, also, in his construction of the law and regulations on the subject of substitution. As far as the question of jurisdiction is concerned, I rest my conclusion upon my own argument, and do not assent to the reasoning which concedes jurisdiction to the State courts in some cases, and denies it in others.

This opinion has been swelled to a great length by the numerous and extended quotations made in it. My apology for this is, that I have felt solicitous to vindicate my position with the bar of the State; and I thought it would be better to make the literal extracts found in this opinion, because many belonging to the profession may not have the time or opportunity to examine the works from which the quotations are made. At the time when I wrote my first opinion, there had been only one or two adjudications upon the subject in the Confederate States. The question has been now, expressly and by implication, passed upon

by several of the appellate State tribunals in our Confederacy; and in no case known to me has an appellate State court sustained the doctrine which I maintain. Both of my brother judges differ from me. There has not yet been established a supreme court of the Confederacy, which could serve as a common arbiter, to whose decision all would submit. Under the circumstances described, I must treat the question as settled for the present; and although not convinced of any error in my reasoning and conclusions, I shall, so long as those circumstances continue to exist, suffer the State jurisdiction to be exercised, to the extent agreed upon by this court, without further controversy.

R. W. WALKER, J.—This case presents the question of the power of the State courts to discharge, on *habeas corpus*, persons illegally held in custody by the enrolling officers of the Confederate States, under the asserted authority of the acts of congress popularly known as the "conscript laws." I am strongly inclined to the opinion, that the jurisdiction of the State courts to issue the writ of *habeas corpus*, to bring in persons held as conscripts under the alleged authority of these laws, and to try the lawfulness of their detention, is concurrent and *co-extensive* with the jurisdiction of the Confederate courts in the premises. At all events, I am thoroughly satisfied, that whenever a person in the custody of an enrolling officer in this State shows that he belongs to any one of the classes of persons expressly "exempted" from military service by the laws of congress; or that, having furnished a substitute, he has obtained a discharge, which is still valid and operative; or that he is not of conscript age; or that, because of non-residence, color, or other legitimate reason, the law of conscription does not apply to him, it is not only the right, but the sacred duty of the judges of the State courts, to discharge him on *habeas corpus*.

The only question necessarily presented, and, as I understand it, the only question actually decided in Ex parte

*Hill*, at the last term, (in which I did not sit,) was as to the jurisdiction of the State courts, on *habeas corpus*, to discharge on the ground of physical incapacity, persons in the custody of the enrolling officer, who fail to show that they have been " *held* unfit for military service, by reason of bodily incapacity, under rules prescribed by the secretary of war." On that question I prefer to withhold an opinion for the present ; contenting myself with saying, that if the State courts have no power to discharge in such a case, it must be because a person who has not been " *held* unfit for military service, by reason of bodily incapacity, under rules prescribed by the secretary of war," is not legally exempt from conscription, although he may be *in fact* unfit for military service on account of such incapacity. If that be so, the enrollment and detention of such a person as a conscript are authorized by law ; and, consequently, the judges of the Confederate courts would not, any more than those of the State courts, have power to discharge him on *habeas corpus.*

The application for the prohibition is placed upon the ground, that the probate judge, in issuing the writ of *habeas corpus*, and taking cogizance of the matters therein mentioned, has " acted without authority of law, and usurped jurisdiction of matters which are only cognizable before the judicial or military tribunals of the Confederate States." I think it should be overruled, even if it should appear that the state of facts set forth in the petition for *habeas corpus* does not with complete certainty exclude the idea that the petitioner may be now liable to enrollment. The writ of prohibition ought not to be granted in such a case, unless it is plainly shown that the judge was proceeding to try a question, or exercise an authority, out of his jurisdiction.

As the subject is one of the gravest import, and as the state of my health disables me at present from stating at large the grounds of my opinion as to the existence and extent of the jurisdiction of the State courts, on *habeas corpus*, in cases arising under the conscription laws, I wish to

reserve the privilege of preparing and filing hereafter another opinion in this case, in which I will express more fully my views on this interesting and important question.

NOTE BY THE REPORTER.—The foregoing opinion of R. W. WALKER, J., applies only to *Armistead's case*, and seems to exclude the expression of an opinion in *Dudley's case*. But Judge W. afterwards instructed the reporter, in publishing the cases, to state that he dissented from the decision of the court in the latter case, unless, in the meantime, he himself prepared and filed another opinion, expressing more fully his views.